USCA1 Opinion

 

 June 21, 1994 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-2228 UNITED STATES OF AMERICA, Appellee, v. RAMON HERNANDEZ COPLIN, Defendant, Appellant. ____________________ ERRATA SHEET The court's opinion of March 31, 1994, is amended by inserting a new footnote 9, immediately following "Cf. U.S.S.G. ___ 5G1.2(d)." at page 20, line 24, which reads as follows: "[T]he total punishment" under U.S.S.G. 5G1.2 is normally determined by the guideline range, see id., subsection (b), but ___ ___ where the sentencing court lawfully departs from the guideline range, "the total punishment" is the punishment specified as a result of that departure; and sentences then run consecutively "to the extent necessary to provide a combined sentence equal to the total punishment." See id. subsection (d). ___ ___ UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 92-2228 UNITED STATES OF AMERICA, Appellee, v. RAMON HERNANDEZ COPLIN, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Jose Antonio Fuste, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Coffin, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ ____________________ Laura Maldonado Rodriguez, Assistant Federal Public Defender, __________________________ with whom Benicio Sanchez Rivera, Federal Public Defender, was on _______________________ brief for appellant. Edwin O. Vazquez, Assistant United States Attorney, with whom _________________ Guillermo Gil, United States Attorney, and Jose A. Quiles-Espinosa, _____________ ________________________ Senior Litigation Counsel, were on brief for the United States. ____________________ March 31, 1994 ____________________ BOUDIN, Circuit Judge. Ramon Hernandez Coplin was ______________ indicted by a grand jury in two separate indictments, each relating to a separate episode of smuggling aliens into the United States. The first indictment charged that Hernandez on April 16, 1992, had been captain of a yawl intercepted a mile off the coast of Puerto Rico carrying 92 illegal aliens from the Dominican Republic. The yawl was running without lights, had no safety equipment and sought to avoid capture. Hernandez, and his assistant Julio Reyes Acosta, were charged in four counts with seeking to smuggle four of the alien passengers into the United States. 8 U.S.C. 1234(a)(1)(A). Thereafter, on July 1, 1992, Hernandez and Reyes were charged in a second indictment with six counts, under the same statute, for seeking to smuggle six aliens into the United States on March 26, 1992. On this earlier occasion a yawl had been used, about the same number of passengers were aboard, and the same Puerto Rican coastline approached. Two women drowned that night and their bodies washed up upon the shore. The yawl made its way back to the Dominican Republic. As in the earlier indictment, each count related to a different alien. On July 6, 1992, Hernandez pled guilty to all counts of both indictments pursuant to a plea agreement. In exchange for the pleas, the prosecutor agreed to dismiss yet another federal indictment against Hernandez (for illegally -2- -2- reentering the United States after a prior deportation) but made no other promises. Reyes entered guilty pleas at the same time. In the change of plea hearing, the government submitted a written version of what it said its trial evidence would show. Reyes agreed with the government's version of events; Hernandez did so only with a qualification. The present appeal revolves around that disagreement. In substance, Hernandez and Reyes both admitted that they had been engaged in the smuggling operations charged in the indictments. As to the March 26 operation, the government's written version of events included the following language (the emphasis is ours): At approximately midnight and while the yawl was approximately 100 yards from the beach at Aguadilla, Puerto Rico, an aircraft was heard in the vicinity. At said time, the captain of the yawl, that was later identified as defendant Ramon Hernandez Coplin, initially told the passenger (sic) that they must jump into the water because he did not want to be arrested. Due to the fact that _____________________ some passengers were hesitating to jump, defendant ___________________________________________________ Ramon Hernandez Coplin drew a gun and ordered them ___________________________________________________ to jump into the water. _______________________ The evidence will show that females were yelling that they did not know how to swim or for help because they were drowning. Defendant Ramon Hernandez Coplin and his assistant, defendant Julio Reyes Acosta, who aided and abetted in the piloting of the yawl, ignored the pleas of the females and continued offshore back to the Dominican Republic to avoid arrest. At the hearing, the trial judge summarized the government's proffer, including the portion that we have -3- -3- emphasized, and Reyes agreed (under oath) that the proffer was accurate. Hernandez' counsel said that Hernandez also accepted the proffer except that "he [Hernandez] has told me that at no time did he point a gun at anybody, or, and also that he did not push off the boat, anybody." The district judge then said this factual dispute should be the object of evidence in the sentencing hearing. The district judge then drew a line through the words emphasized above and Hernandez signed the amended version of the proffer. The guilty pleas were then accepted.1 On September 9, 1992, a sentencing hearing was held for Hernandez. The government presented as a witness one of the aliens smuggled into Puerto Rico on March 26; testifying through an interpreter, the witness said that Hernandez "had like a revolver in his hand and said, `Everybody jump in, everybody jump in.'" The witness also testified that "the ladies were screaming that they were going to drown." Defense counsel did not cross examine but the district judge then asked, "Are you sure it was a gun?" The witness replied, "I knew it as a revolver." ____________________ 1Hernandez maintained his position when interviewed by the probation officer, but the probation officer disbelieved him. In objections to the pre-sentence report, Hernandez denied ordering anyone to jump into the water 100 yards from the beach; asserted that the boat had actually hit the beach; denied that he had any weapons; and seemingly denied that he had known that the two women who had died were in danger. -4- -4- The defense then called Hernandez who testified under oath through an interpreter. He testified that when the boat reached the shore "the people got out of the boat quite comfortably and started heading in land (sic)" and that he did not hear anyone scream. On cross examination, Hernandez said, "I never forced anybody, I didn't have a weapon. I have never used a firearm." Finally, the government called an agent of the Immigration and Naturalization Service to refute Hernandez' claims that the boat had reached the shore; the INS agent, based on the survival of the yawl and on interviews with six passengers, gave his opinion that the yawl had not reached the beach in Puerto Rico on March 26. Reyes was not called as a witness by either side. The district judge then made an express finding that Hernandez had brandished a gun and threatened the two women who, as a result, jumped into the water and drowned. The court also inquired into Reyes' failure to appear to reaffirm his own testimony as to the gun given at the change of plea hearing, and Reyes' apparent unwillingness to reaffirm that testimony to the probation officer. Reyes' counsel then stated that his client told him that "he [Reyes] was afraid of Mr. Coplin, and that he would not testify in front of Mr. Coplin as to that matter." After allowing defense counsel and Hernandez to speak to the proper sentence, the court computed the offense levels -5- -5- under the Sentencing Guidelines.2 The court found that the base offense level was 9 for the March 26 operation and 9 for the April 16 operation. U.S.S.G. 2L1.1. The court then increased both offense levels by two points each because of the supervisory authority Hernandez exercised over Reyes. U.S.S.G. 3B1.1(c). The court reduced the figure by two points as to the April 16 operation for acceptance of responsibility, U.S.S.G. 3E1.1; but the court refused to make a similar reduction as to the March 26 operation because Hernandez had not accepted "full responsibility" for his involvement, "[s]pecifically on the issue of the gun and . . . the deaths." The adjusted offense levels corresponded to imprisonment ranges of 8 to 14 months for the March 26 operation and 4 to 10 months for the April 16 operation. However, the court invoked its authority to depart upward, 18 U.S.C. 3553(b), and it imposed sentences of five years' imprisonment for the March 26 operation and four years' imprisonment for the April 16 operation, specifying that the two sentences were to be served consecutively. The court found a departure warranted in both cases by the very dangerous conditions of transportation in the yawl (e.g., lack of safety equipment ____ ____________________ 2The 1991 version of the guidelines was in effect at the time of sentencing and all citations in this opinion are to that edition of the guidelines unless otherwise specified. -6- -6- and supplies); and the firearm and deaths were found to be aggravating circumstances in the March 26 operation. 1. On appeal, Hernandez begins by challenging the departure. Most of the discussion under this head is effectively an attack on the district court's findings and characterizations. The trial judge's findings on sentencing may be set aside only if clearly erroneous. See United ___ ______ States v. Pineda, 981 F.2d 569, 572 (1st Cir. 1992). ______ ______ Nevertheless, given the magnitude of the departure, the specific criticisms made by counsel deserve careful attention. First, at sentencing, the district judge orally described Hernandez' conduct in the March 26 operation as reckless and criminal behavior resulting in the deaths of two persons. In the same description, the judge used the word "murder" in referring to the incident. In a formal sentencing memorandum, issued a week or so after the sentencing, the court elaborated on the dangerous conditions in which Hernandez had transported the aliens and then referred, "in addition," to Hernandez' "reckless and criminal behavior, which resulted in the death-murder of two human beings." United States v. Hernandez-Coplin, 802 F. Supp. ______________ ________________ 657, 661 (D.P.R. 1992). Hernandez now points out that the probation officer, after interviewing the defendant, concluded that it was "highly probable" that Hernandez did not anticipate the death -7- -7- of any of his passengers. But there is no inconsistency between the probation officer's statement and the district court's summing up of the matter, even assuming that an inconsistency mattered. Indeed, while the probation officer did not use the word "murder," he did say that forcing the passengers out of the yawl into heavy tides reflected a reckless disregard for human life and the danger posed to the passengers was reasonably foreseeable. We think that the trial judge, like the probation officer, was describing Hernandez' conduct as criminally reckless and that the word "murder" was used colloquially to stress the outrageousness of the conduct and to underscore the evident danger of death that the conduct posed. So read, the word "murder" is the kind of moral flourish that is routine at sentencing and wholly within the trial judge's discretion. As it happens, Hernandez' conduct might well constitute the offense of murder in some jurisdictions, under the felony murder doctrine or merely because the conduct created a sufficiently direct and foreseeable risk of death. Second, a further challenge to the departure, defendant's brief in this court takes issue with the district court's finding that Hernandez did threaten the passengers with a gun. The brief points out that he consistently denied doing so, that no gun was found, and that the passenger- witness spoke of the defendant as having "like" a gun in his -8- -8- hand. The first two points are rather easily explained--the defendant had a motive to lie and was not captured on the March 26 trip--and the third is based on an incomplete version of the testimony: after the passenger witness' ambiguous reference to "like," the trial judge (as already noted) specifically asked the witness whether he saw a gun and received an affirmative reply. In all events, the trial judge heard both the passenger witness and Hernandez testify and specifically resolved the credibility issue against the latter. Reyes, the co- defendant, also agreed that the gun had been used, before he refused to testify--quite possibly out of fear. The probation officer's report spoke of the use of a handgun by the defendant being "substantiated by more than one of the alien witnesses" interviewed by INS. No reviewing court could possibly find that the district court's own finding that a gun was used lacked evidentiary support or was clearly erroneous. Third, Hernandez argues that the magnitude of the departure in this case is "inordinately unreasonable," arguing that it amounted to an increase of almost 700 percent over the guideline ranges otherwise applicable. Mathematics aside, the departure was certainly substantial, the sentence for the March 26 operation being the statutory maximum of five years and the four-year sentence for the April 16 operation being several times the guideline maximum. -9- -9- There is no doubt that the district court was entitled to depart from the guideline range in both cases, based solely upon the dangerous conditions created by an inadequately equipped vessel. This is a ground for a departure, as the guidelines and case law make clear, U.S.S.G. 2L1.1, application note 8; United States v. Reyes, _____________ _____ 927 F.2d 48, 52 (1st Cir. 1991), and the undisputed evidence supports such a finding. It was also clearly permissible under this rubric to treat as a further aggravating factor the fact, as found by the district court, that Hernandez had forced passengers into the water resulting in two deaths. U.S.S.G. 5K2.1. As to the magnitude of the departure, the test is whether the departure is "reasonable" and under the case law the standard of review is quite deferential to the district judge. Reyes, 927 F.2d at 52-53. The "multiple" represented _____ by the departure may be unusual in this case, but the number of voyagers endangered on the second trip and the fact of two deaths on the first trip also distinguish this case. The sentencing memorandum sets forth in detail the basis for finding that the passengers on both trips were recklessly endangered. 802 F. Supp. at 658-61. We do not think that the district judge's choice exceeded permissible bounds. 2. In his second argument, Hernandez attacks the district court's failure to allow a two point reduction for acceptance of responsibility in relation to the March 26 -10- -10- operation. Although the district judge did allow such a reduction for the April 16 operation, based primarily upon the guilty plea, he denied that reduction for the March 26 operation because Hernandez refused to admit that he had used a gun and had forced passengers from the boat. This denial, says Hernandez, is improper because he did admit to the March 26 smuggling operation and is not required to accept responsibility for other acts not charged in the indictment. This seemingly straightforward issue has engaged courts, and the Sentencing Commission, in a remarkable amount of controversy. Construing the pertinent guideline as it read prior to November 1, 1992,3 this court held that as a matter of construction the guideline did not call upon the defendant (as a condition of obtaining the reduction) to admit to conduct charged in other, related counts that had been dismissed. United States v. Perez-Franco, 873 F.2d 455 (1st _____________ ____________ Cir. 1989). Indeed, two of the three panel members opined that any such condition could violate the Fifth Amendment's privilege against self-incrimination. Id. at 461-64. ___ Thereafter, the Sentencing Commission altered the guideline's application note, effective November 1, 1992, to ____________________ 3At that time, the guideline provided--in the 1991 version which applies to this case--that in determining whether the defendant accepted responsibility for "his criminal conduct," U.S.S.G. 3E1.1(a), the court could consider whether the defendant had admitted to involvement in "the offense [of conviction] and related conduct." Id., ___ application note 1(c). -11- -11- make clear that acceptance of responsibility required the court to consider the defendant's action in truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under 1B1.3 (Relevant Conduct). U.S.S.G. 3E1.1, application note 1(a) (1992). Thus, under the revised guideline the defendant must admit to the conduct comprising the offense and either admit or remain silent as to other relevant conduct. Relevant conduct includes "all actions and omissions committed . . . by the defendant . . . that occurred during the commission of the offense of conviction . . . ." U.S.S.G. 1B1.3(a)(1). Under this version of the guidelines, Hernandez would receive no reduction for acceptance of responsibility as to the March 26 offense. Forcing passengers into the water with a gun is clearly relevant conduct; and Hernandez did not accept responsibility for it or remain silent but, as supportably found by the district judge, lied by affirmatively denying that conduct. Whatever the Fifth Amendment implications of requiring the defendant to admit to _____ another crime, it is clear that the defendant has no license to lie about the other crime and can be penalized under the guidelines for doing so. See United States v. Dunnigan, 113 ___ _____________ ________ S. Ct. 1111 (1993). -12- -12- Hernandez, however, was not directly subject to this version of the guidelines which became effective after he was sentenced. The version of section 3E1.1 in effect at sentencing, as construed by this court in Perez-Franco, ____________ arguably did not require Hernandez to accept responsibility for anything other than smuggling, see 873 F.2d at 459, and ___ it is debatable whether the pertinent changes in the current version should be viewed as a clarification or, instead, as a substantive change that could not be applied retroactively under the ex post facto clause. See Ebbole v. United States, _____________ ___ ______ _____________ 8 F.3d 530 (7th Cir. 1993) (holding the amendment to be substantive), cert. denied, 62 U.S.L.W. 3589 (U.S. Mar. 7, ____ ______ 1994). We have concluded that these problems need not be resolved in this case. Assuming that Hernandez was entitled to the two- point reduction for acceptance of responsibility, his false denial--we must regard it as such given the trial court's findings--also required a two-point increase for ________ obstruction of justice under U.S.S.G. 3C1.1. This long- standing provision, which presents no ex post facto problem ______________ in this case, requires a two-level increase for willful attempts to obstruct justice, at sentencing or otherwise, and it includes "providing materially false information to a judge or magistrate." Id., application note 3(f). The ___ -13- -13- enhancement is mandatory. United States v. Austin, 948 F.2d _____________ ______ 783, 789 (1st Cir. 1991). This language fully captures Hernandez' action in denying to the judge that he had used a gun and forced passengers off his boat into the water. His denials are of record; the court found them to be lies; and Hernandez knew what had occurred on the boat and cannot have been innocently inaccurate. The materiality requirement is satisfied, for a judge might well take account of the gun episode in sentencing the defendant for smuggling; indeed, the judge in this case warned of this possibility at the guilty plea hearing. Even if the most demanding test of willfulness were employed, we think that Hernandez had to have made his statements with knowledge that they might affect his sentence.4 Thus even if we assume that a two-point reduction should have been accorded, it is offset by a two-point increase that should have been imposed. The fact that the government did not seek this enhancement certainly does not prevent us from taking note of it in the present context: at worst, the district court gave the wrong reason for reaching the right ____________________ 4The Supreme Court's decision in United States v. ______________ Dunnigan, 113 S. Ct. 1111 (1993), suggests that the ________ willfulness requirement is actually less demanding, and may be satisfied by showing that the defendant lied under oath and that the matter lied about is material--regardless of whether the defendant knew that the lie might affect the outcome. 113 S. Ct. at 1116. -14- -14- result in its calculation. Accordingly, the supposed error if it occurred was harmless to the defendant. 3. In his final attack, Hernandez' brief poses the question whether the district court erred in refusing to group together the counts in the two separate indictments. The gist of the argument is that, according to Hernandez, the district court was required by U.S.S.G. 5G1.3 to treat all of the counts of the two indictments together and to apply to them the grouping rules contained in U.S.S.G. 3D1.1 et seq. ______ Hernandez' brief claims that these computations would produce a total offense level of 11, and a maximum guideline range of 8 to 14 months. In this case, we think there is a problem with the computation of two separate guideline ranges, although our reasoning and result differ from the position urged by Hernandez. Despite Hernandez' reliance on U.S.S.G. 5G1.3(b), that section almost certainly has nothing to do with this case. The portion of that section invoked by Hernandez concerned a defendant who was sentenced under the guidelines while still subject to an unexpired guidelines sentence previously imposed. With certain exceptions, 5G1.3(b) provided that in such a case the new sentence should be computed so that the old and new sentences together would "equal the total punishment that would have been imposed under 5G1.2 . . . -15- -15- had all the sentences been imposed at the same time."5 In our view U.S.S.G. 5G1.3(b) refers to cases in which two sentences are imposed on different occasions. _________ Admittedly, this is not crystal clear from the language of the provision itself; one might argue from the words alone that the provision also embraces a case where two sentences are imposed sequentially by the same judge on the same day. But this reading is implicitly refuted by the commentary to U.S.S.G. 5G1.2 which already provides that the multiple _______ count provisions apply not only to multiple counts in the same indictment but also to multiple counts "contained in different indictments or information for which sentences are to be imposed at the same time or in a consolidated proceeding." In other words, the government is right in arguing that U.S.S.G. 5G1.3 did not apply, but Hernandez is correct in thinking that the concept embodied in U.S.S.G. 5G1.2 applies anyway.6 ____________________ 5The language that arguably made U.S.S.G. 5G1.3(b) applicable to this case was subsequently deleted from the guidelines, see U.S.S.G., App. C, amendment no. 465, at 290 ___ (1992), but we consider the guideline language as it stood in 1991. 6We say "the concept" because formally part 5G, containing 5G1.2, does not itself come into play until the court has determined a guideline range, and then chosen a specific sentence within or (where a departure occurs) outside the range. Still, 5G1.2 would not make much sense unless we also assumed that the grouping rules under chapter 3, part D had previously been applied to counts "contained in different indictments . . . for which sentences are to be imposed at the same time." Accordingly, we read this concept -16- -16- This, however, is only the first step in the sequence. Even if one treats the use of two indictments rather than one as irrelevant to sentencing, the question remains how to apply the guidelines to the multiple counts in this case. The grouping rules answer this question by first directing that the district court group together into a single group each set of "closely related counts." U.S.S.G. 3D1.1(a). Hernandez argued at length to the district court, and appears to assume in this court, that all ten counts to which Hernandez pled guilty comprised one group of closely-related counts. If this were so, the total offense level for the entire group would be the offense level for the single most serious count. U.S.S.G. 3D1.3. But it is not so because under the guideline definition of closely related counts, the counts relating to the March 26 smuggling operation constitute one group of closely related counts and the counts relating to the April 16 operation constitute a separate group of closely related ________ counts. The grouping rules expressly say that counts are not to be grouped together where the "[t]he defendant is convicted of two counts, each for unlawfully bringing one alien into the United States, but on different occasions." U.S.S.G. 3D1.2(b), application note 3, example 7. Thus the district court was quite correct in rejecting Hernandez' ____________________ into chapter 3, part D. -17- -17- request to treat all of the counts in both indictments as a single group of closely related counts. It does not follow, however, that separate guideline ranges are to be used for the two indictments. Rather, where the multiple count grouping rules apply but there is more than one group of closely related counts, the groups must be combined according to a formula specified in U.S.S.G. 3D1.4. It is not entirely surprising that the district judge overlooked the final step: neither the prosecutor nor defense counsel argued for this outcome; the probation officer apparently overlooked the point; and it is hardly intuitive that a defendant should receive a volume discount in sentencing for arguably unrelated offenses. Why this discount is made available by U.S.S.G. 3D1.4 is nowhere explained in the guidelines. It appears, however, that the guideline drafters were trying to assure some discount for crimes that did not happen to fall within the closely related count definitions but were still sufficiently related so that merely to compute individual sentences and add them together would overstate the seriousness of the offenses.7 However, the guidelines as drafted operate ___________ ____________________ 7For example, a defendant who in a single criminal episode (say, a bank robbery) injured two persons would not normally have the separate counts for the two injuries grouped as "closely related," because two separate victims are involved. U.S.S.G. 3D1.2. But it might be thought by some, including the guideline drafters, that such conduct is more culpable than injuring a single victim but less culpable -18- -18- generally, perhaps crudely, by offering the discount wherever the multiple counts happen to be charged in the same indictment (or, as we read the guidelines, wherever the defendant is sentenced at the same time under multiple indictments). Because it turns on mechanical choices (namely, the choice to use a single indictment or treat multiple indictments together), the volume discount for counts that are not closely related may sometimes turn out to be available where its apparent rationale does not apply. Pertinently, a discount might be warranted where two aliens are smuggled on a single trip (indeed, the guidelines treat the counts as closely related); but it may be harder to see why a discount should be applied for two separate smuggling ventures at separate times, even though they may be the subject of a single indictment or two indictments handled together. Any such anomaly, however, can be handled by sentencing at the high point of the range or by a departure. In all events, the discount is explicit: a "combined offense level is determined by taking the offense level applicable to the Group with the highest offense level and increasing that offense level by the amount indicated in the . . . [specified] table." U.S.S.G. 3D1.4. We have already ____________________ than injuring two victims in two entirely different episodes. -19- -19- explained why we agree that the district court reached the right result (or at least one as favorable as the defendant deserved) in computing an offense level of 11 for the March 26 operation. At this point, U.S.S.G. 3D1.4 called upon the district judge to increase this figure by 2 levels to create a combined offense level of 13.8 Instead, the district court treated the two indictments as giving rise to separate offense levels and to separate guideline sentencing ranges. The question remains whether the omission of the final refinement had any bearing on the total sentence imposed by the district court. If the district court had sentenced within the guideline range, the proper offense level of 13 ______ would have dictated a sentence of imprisonment of 12 to 18 months. The judge chose instead to depart very substantially, imposing a total term of imprisonment of nine years. Looking to the factors that apparently underlay the judge's departure, one may doubt whether the failure to combine the two offense levels made any difference in the ultimate sentence of nine years. Nevertheless, we have chosen to vacate the sentences and remand for resentencing because we cannot be confident that ____________________ 8The formula in U.S.S.G. 3D1.4(a) calls for a two- level increase where (as here) there is a second group of closely-related counts whose offense level is as serious as or within 1 to 4 levels less serious than the most serious group. -20- -20- the mistake was harmless. See Williams v. United States, 112 ___ ________ _____________ S. Ct. 1112, 1121 (1992). Resentencing in this instance requires no additional evidence and is only a small administrative burden. Even small adjustments could make a lot of difference to the defendant. Above all, the great latitude possessed by the district court in deciding how far to depart makes it all the more important that the district judge exercise a fully informed discretion. At least in this case, we think this information should include the correct computation of the point of departure. The use of a single combined offense level in no way prevents the district judge from imposing a sentence of nine years on remand. The various grouping rules are used in determining the guideline sentence range; once the judge _________ determines to depart from that range, the statutory maximum is derived by adding up the maximums for each of the counts on which the defendant was convicted, here five years for each of ten counts. Cf. U.S.S.G. 5G1.2(d).9 Of course, ___ no one suggests that a sentence of fifty years would be a ____________________ 9 "[T]he total punishment" under U.S.S.G. 561.2 is normally determined by the guideline range, see id., ___ ___ subsection (b), but where the sentencing court lawfully departs from the guideline range, "the total punishment" is the punishment specified as a result of that departure; and sentences then run consecutively "to the extent necessary to provide a combined sentence equal to the total punishment." See id. subsection (d). ___ ___ -21- -21- proper departure, but that is because of the reasonableness requirement and not on account of the grouping rules. The grouping rules are one of those chapters in the Sentencing Guidelines where practical judgments, unexplained policy choices, and extreme complexity are so fused that even the most expert of lawyers and judges can be led astray. The glitches that occurred here cast no reflection on the very able district judge. Whatever one's conception of the right sentence in this tragic case, the district court approached the matter with the care, concern and seriousness that sentencing issues always deserve. The sentences are vacated and the case is remanded for _______ ________ resentencing on the premise that the point of departure is a combined offense level of 13. It is so ordered. ________________ -22- -22-