UNITED STATES of America, Plaintiff,

v.

Steven M. ROSTOFF and David R. Rostoff, Defendants.

Civil Action Nos. 96–10558–WGY, 96–10559–PBS.

United States District Court, D. Massachusetts.

June 3, 1997.

Rayford A. Farquhar, U.S. Attorney, Christopher Alberto, U.S. Attorney's Office, Boston, MA, for U.S.

Michael J. Traft, Carney & Bassil, Boston, MA, for Steven M. Rostoff, David Rostoff.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

This case arose out of a criminal action in which two brothers, Steven M. and David R. Rostoff (collectively, the "Rostoffs"), were convicted of conspiracy, 18 U.S.C. § 371, bank fraud, 18 U.S.C. § 1344, and making false statements, 18 U.S.C. § 1014. *United States v. Steven M. Rostoff*, Crim. No. 92–10006–01–Z; *United States v. David Rostoff*, Crim. No. 92–10006–02–Z), *aff'd United States v. Rostoff*, 53 F.3d 398 (1st Cir.1995).[1]

1. The Rostoffs' convictions are the result of a failed foray into the New England condominium

The presiding judge, the Honorable Rya Zobel, sentenced each Rostoff to 15 months in prison followed by two years of supervised release, ordered each to pay a special assessment of $3,650.00 immediately, and, pursuant to the Victim and Witness Protection Act of 1982, 18 U.S.C. § 3663, ordered each to pay restitution to the Federal Deposit Insurance Corporation of an amount "not to exceed $650,000 without interest."[2]

In imposing the restitution orders, Judge Zobel also stated that "I'm sure counsel will explain to defendants that if at the end of probation there is no possibility of the [$650,000.00] being paid, then it will be remitted." The period of supervised release for each brother ended on March 31, 1996. During that period, Steven made restitution payments of $7,463.21 and David made payments of $8,200.00—amounting to 1.17% and 1.26% of the total restitution orders, respectively. The remainder of the restitution remains unpaid.

In March, 1996, the United States commenced this action,[3] seeking to convert the unpaid portions of the criminal restitution orders into civil judgments pursuant to the Federal Debt Collection Procedures Act (the "Debt Collection Act"), 28 U.S.C. § 3001 *et seq.* In denying the government's motion for summary judgment, this Court held that 1) the Debt Collection Act does in fact allow the government to convert an unpaid restitution order into a civil judgment in this manner, but 2) in light of Judge Zobel's qualifying language regarding the ability to pay, a genuine issue of material fact remained for trial as to whether, at the end of the supervised release period, there was any "possibility of the [$650,000.00] being paid." *United States v. Rostoff*, 956 F.Supp. 38, 44–45 (D.Mass. 1997).

After conducting a four day bench trial on precisely this question, this Court, on May 2, 1997, made oral findings and rulings from the bench and entered civil judgments in favor of the United States against Steven Rostoff for $706,790.47 and against David Rostoff for $705,980.00. In each case, the judgment represents the entire balance of restitution which remained unpaid at the end of the supervised release period, plus a ten percent surcharge imposed pursuant to 28 U.S.C. § 3011(a). The Rostoffs now bring a timely motion under Fed.R.Civ.P. 59 and Fed. R.Civ.P. 52(b) to alter or amend the Court's judgment. This memorandum addresses the motion to alter and amend and, in so doing, sets forth the Court's oral findings and rulings in a more reflective and analytical fashion.

## I. THE STATUTORY FRAMEWORK

■ The Debt Collection Act provides the "exclusive civil procedures for the United States ... to recover a judgment on a debt." 28 U.S.C. § 3001(a)(1). The act defines a judgment as a "judgment, order, or decree entered in favor of the United States in a court and arising from a civil or criminal proceeding regarding a debt." 28 U.S.C. § 3002(8). Debt is defined as "an amount that is owing to the United States on account of a ... fine, assessment, penalty, [or] restitution...." 28 U.S.C. § 3002(3)(B). This Court holds that, in enacting this statute, Congress intended to create a holistic, unitary, and simple approach to collecting debts due the United States, including restitutionary debts arising under the Victim and Witness Protection Act, 18 U.S.C. § 3663. Allowing the Debt Collection Act to be used in this manner "supports both the public policy encouraging adherence to court-ordered res-

---

market during the mid to late 1980's, in which the Rostoffs coordinated a conspiracy to defraud a local bank of at least $2,000,000.00. For a more thorough exposition of the facts giving rise to their convictions, see the First Circuit's opinion in *Rostoff*, 53 F.3d at 402–04.

**2.** In rendering its decision from the bench, this Court inadvertently stated that $650,000.00 was the amount of restitution to be paid by Steven and David Rostoff in the aggregate, with liability being joint and several. In fact, Judge Zobel

imposed separate restitution orders upon each defendant, with each brother liable for an amount not to exceed $650,000.00. This misstatement in no way alters the rest of the Court's analysis.

**3.** The government actually filed individual suits against each brother. With the parties' consent, this Court consolidated the two actions *sua sponte* at a motion session on October 24, 1996, because they raised identical issues of fact and law. *See* Local Rule 40.1(f) and (h).

titution orders under the Victim [and] Witness Protection Act, as well as the letter and spirit of the law as codified in 18 U.S.C. § 3663." *Rostoff,* 956 F.Supp. at 44. Having reviewed both statutes, the Court concludes the process should operate as follows:

 A restitution order, properly entered as part of a criminal judgment, is in the nature of a mandatory, equitable injunction that is intended to be self-executing.[4] The burden of compliance rests neither with the executive (*i.e.,* law enforcement officers) nor judicial (*i.e.,* probation officers) branches of government, but rather falls directly upon the offender himself. *See* 18 U.S.C. § 3664. Once a criminal judgment of restitution has entered, the offender has a *duty* to marshal all of his assets in an effort to satisfy it. *See id.* The only assets not available for restitution are 1) assets subject to superior, secured interests of innocent third parties, and 2) those assets necessary for the criminal offender to house, clothe, and feed himself and those to whom he owes a statutory or common law duty of support. This Court emphasizes that the second exception does not permit the offender to maintain the level of luxury to which he had grown accustomed prior to the offense.

 The offender's duty to marshal his assets will often require liquidating them and using the proceeds to satisfy the restitution order, but the offender should not engage in sales that are contrary to sound business judgment. When assets can be sold only at a price that is significantly below their actual economic value, there is no obligation to liquidate. In that circumstance, however, the

offender does have a duty to refrain from alienating or further encumbering the assets, save insofar as necessary to house, feed, and clothe himself and his dependents at the minimal level described previously. If the offender does, in fact, alienate such assets while subject to a restitution order, the alienation is void as against public policy because it directly violates a criminal judgment of a United States District Court. As matter of law, it is as though the transaction never occurred.

Although a restitution order is intended to be self-executing, the sentencing court, with the assistance of the United States Probation Office (the "Probation Office"), *see* 18 U.S.C. § 3601, has significant tools at its disposal to "encourage" compliance during the period of supervised release. Congress has empowered the courts to 1) require the offender to disclose all relevant financial information to the Probation Office, *see* 18 U.S.C. § 3583(d); U.S. Sentencing Guidelines Manual § 5B1.4(b)(18) (1995); *see also United States v. Ismoila* 100 F.3d 380, 394 (5th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1712, 137 L.Ed.2d 836 (1997); 2) direct the sale of assets, with the proceeds to be paid to the victim, *see* 18 U.S.C. § 3664(f)(3); or 3) order that assets be paid into the court or be transferred in kind to the victim to whom the restitution is owed, *see id.* If the offender conceals assets from the Probation Office or fails to make payments as directed, the sentencing judge may revoke the supervised release and return the offender to prison. 18 U.S.C. § 3583(d).[5] Congress has therefore given the sentencing court (and the Probation Office) significant leverage to pressure a

---

4. As this Court has previously stated:

[T]he Court is not required to make a determination that [a defendant] is able to pay the full amount of restitution before such an order may be made. *United States v. Lombardi,* 5 F.3d 568, 572–73 (1st Cir.1993) (district court not required to make explicit findings of defendant's financial condition); *United States v. Savoie,* 985 F.2d 612, 618 (1st Cir.1993) (no need to make open-court findings). Nor must there exist a record basis for an affirmative finding that [a defendant] has the current ability, or is likely to have the future ability, to fulfill his restitution obligation. *Lombardi,* 5 F.3d at 572–73; *see also United States v. Brandon,* 17 F.3d 409, 461 (1st Cir.1994) (determination of defendant's indigency independent

of and does not effect $500,000 restitution order).

*United States v. Lilly,* 901 F.Supp. 25, 31 (D.Mass.1995), *aff'd* 80 F.3d 24· (1st Cir.1996); *see also* Boston Bar Foundation, *Lawyering Skills for the Criminal Lawyer* 227 (May 20, 1997) ("In making a restitution order, the court is not required to find that the defendant can pay it").

5. In this case, for example, Judge Zobel ordered the Rostoffs to pay restitution in installments according to a schedule of payments as established by the Probation Office, and, pursuant to 18 U.S.C. § 3583, conditioned their supervised release upon the full disclosure of any financial information requested by the Probation Office.

criminal offender to disgorge assets—not just ill-gotten assets, but any assets, however obtained.

Nevertheless, at the end of the supervised release period, restitution orders frequently remain unpaid. In some circumstances, this is because the offender truly lacks the ability to pay. In other instances, however, the offender simply has not paid, and the probation officer, for whatever reason, has not sought a court order requiring the offender to pay over a specific asset or face a return to prison.

■ Once it becomes evident that restitution will not be made in full by the end of the supervised release period, the executive branch may take action to convert the restitution order into a civil judgment pursuant to the Debt Collection Act, 28 U.S.C. § 3001 *et seq.*[6] As Congress intended for the Debt Collection Act and the Victim and Witness Protection Act to operate in tandem with extreme simplicity, it seems logical that the civil case be assigned to the same court that imposed the criminal restitution order. This Court notes that the procedure used in this district to handle motions brought pursuant to 28 U.S.C. § 2255 appears particularly appropriate. Such motions are entered on the criminal docket of the district court that entered the judgment, *see* Federal Rules Governing Section 2255 Proceeding for the United States District Courts, Rule 3(b), and then given a separate civil action number.

■ This Court also notes that after a restitution order is converted into a civil judgment pursuant to the Debt Collection Act, the United States is in the same position as any other creditor. Unlike a federal tax lien, which gives the United States super priority over other creditors, *see* 26 U.S.C. § 6323, in this context the United States is an ordinary judgment creditor, *see* 28 U.S.C. § 3201. Furthermore, if and when the United States seeks to execute upon the civil judgment, the ex-offender, having completed his sentence, is now afforded all the protections of the civil law, including those against

garnishment of wages, *see* 28 U.S.C. § 3203(a), the homestead protections afforded by various states, *see, e.g.,* Fla. Const. art. X, § 4; Tex. Const. art. XVI, § 50; N.Y. C.P.L.R. § 5206 (McKinney 1996); *see also* Peter S. Canellos, *Sheltered From Bankruptcy: Fla. Home Exemption Gives Debtors a Haven,* Boston Globe, Apr. 27, 1997, at A1, and possibly even the protections of the United States Bankruptcy Code. Finally, because the period of supervised release has terminated, the sentencing court (and thus the Probation Department) no longer has the leverage associated with the ability to send the ex-offender back to prison if he refuses to turn over his assets.

The process set forth above is, in the view of this Court, how the two statutes should operate as a general matter. In this particular case, however, Judge Zobel, in entering the criminal judgments against Steven and David Rostoff, stated:

> With respect to the restitution, I have some difficulty understanding the financial data that have been supplied, and I do believe that the government is correct that I should look at it with a view to the future. I will therefore impose restitution not to exceed $650,000 without interest. I'm sure counsel will explain to the defendants that if at the end of probation there is no possibility of that being paid, then it will be remitted.

It is clear to this Court that the language used here by Judge Zobel is part and parcel of the criminal judgments, and therefore binding on this Court in considering whether civil judgments are to be entered in favor of the government. The Rostoffs are before this Court as civil litigants only, and it is not the place of this Court to sanction them for their prior criminal offenses.

Nevertheless, it is the duty of this Court to point out how infelicitous was the remark of my distinguished colleague, given the statutory scheme. I know of no better judge than Judge Zobel. She is now the distinguished Director of the Federal Judicial Center, the educational arm of the United States Courts,

---

**6.** As no statute of limitations defense has been asserted in this case, this Court need not address the question of the proper timing for a motion to convert a restitution order into a civil judgment pursuant to the Debt Collection Act.

and she performs that duty superbly. And I acknowledge that, since the enactment of the Debt Collection Act in 1990, Pub.L. No. 101–647, ch. 36 § 3611, 104 Stat. 4933 (1990), I have made a number of similar and equally infelicitous remarks when sentencing offenders. Indeed, as the Victim and Witness Protection Act seems to require the imposition of a large restitution order even when it is readily apparent that the offender has no assets, *see* 18 U.S.C. § 3663; *United States v. Porter*, 90 F.3d 64, 68–69 (2d Cir.1996); *United States v. Smith*, 944 F.2d 618, 623 (9th Cir.1991), *cert. denied*, 503 U.S. 951, 112 S.Ct. 1515, 117 L.Ed.2d 651 (1992), I too have scratched my head and wondered what Congress had in mind. If the offender cannot possibly pay, it would seem that the government is throwing good money after bad by incurring the costs associated with the enforcement of a restitution order. I too am guilty of saying, "Well, if he were to win the lottery, I suppose he would have the ability to pay, and therefore I'll impose a restitution order."

This Court now acknowledges that all such qualifying remarks are misplaced. Congress has wisely passed the Debt Collection Act, which, properly construed, makes it possible for the government, without much expenditure, to file a simple motion to have the uncollected portion of a restitution order converted into a civil judgment. After civil judgment has entered, it is then up to the United States Attorney's Office, like any civil litigant, to decide whether it is worth seeking to execute upon the judgment against a defendant who is accorded all of the protections of the civil law, or whether the judgment is simply a bad debt to be written off. This cost-benefit analysis is a matter properly committed to the executive branch and, simply put, it is wrong for judges to intrude by qualifying their restitution orders. In the view of this Court, this four day trial would have been unnecessary if the restitution orders had not contained the qualifying language regarding the defendants' ability to pay at the end of the supervised release period.

## II. INTERPRETATION OF THE CRIMINAL JUDGMENTS

Although ill-advised, Judge Zobel's remark that "if at the end of probation there is no possibility of the [$650,000.00 restitution order] being paid then it will be remitted," is part of the criminal judgment, and therefore binding on this Court in determining whether civil judgments are to be entered in favor of the government. Furthermore, this Court interprets Judge Zobel's statement against the backdrop of her concern with the Rostoffs' ability to pay.

■ First, as there is always a "possibility" that even the most indigent offender will win the lottery and be able to pay at some point in the future, the limitation stated by Judge Zobel has meaning only if it is construed to require a *reasonable* possibility of payment. Accordingly, this Court looks only to those assets actually held by Rostoffs during the period of supervised release, rather than speculating as to assets they might acquire in the future by luck or happenstance.

Second, the term "possibility," does contemplate a pay out over time. Thus, even if the assets held by the Rostoffs were not liquid and could not be converted into cash before the end of the supervised release period, so long as there was a reasonable possibility that those assets could be used to pay the restitution at some point in the future, they are relevant to the Court's analysis.

■ Third, Judge Zobel did not authorize the Rostoffs to attempt to evade their restitution obligations by concealing their assets until after the termination of the supervised release period or by alienating them to third parties for no consideration. *See Rostoff*, 956 F.Supp. at 43 ("This is not a game of football, where the Rostoffs may claim victory against the FDIC simply by running out the clock in the fourth quarter of play"). To the contrary, Judge Zobel made her remarks with the knowledge that, as soon as the criminal judgment entered, the Rostoffs were legally required to marshal their assets and make every effort to pay in full. As any transfers or assignments of assets made by the Rostoffs during the period of supervised release are, as matter of law, null and void, *see supra*

page 5, this Court must consider any such assets in determining whether, at the end of supervised release, the Rostoffs had a reasonable possibility of paying the restitution.

## III. FACTUAL FINDINGS

Pursuant to Fed.R.Civ.P. 52(a), the Court makes the following factual findings by a fair preponderance of the evidence:

1. In 1990, David Rostoff and James Harris formed the Hickory Ridge Limited Partnership ("Hickory Ridge"), which owns a 204–apartment complex in Peoria, Illinois.[7] At the time of its establishment, three corporations nominally held the partnership shares. Sifting through these corporate entities, the Court finds that Hickory Ridge was owned by David Rostoff (59.167%), his wife Harriet Rostoff (40.167%), Stewart Levy (.5%), and James Harris (.167%). Steven Rostoff had no involvement in Hickory Ridge.

2. Hickory Ridge purportedly retained NHS Properties ("NHS"), a property management company in Indiana run by Jeffrey Symmonds, and KHR Properties ("KHR") to co-manage the apartment complex. Harriet Rostoff (the wife of David Rostoff) and Karen Harris (the wife of James Harris) each owned a 50% interest in KHR.

3. In reality, the active management of Hickory Ridge was conducted almost entirely by NHS. KHR had no employees, and was nothing more than a corporate shell used to funnel income to David Rostoff and James Harris—through their wives—in the form of "partner management fees."

4. In October, 1995, during the period of supervised release, David Rostoff, James Harris, and Stewart Levy transferred their ownership interests in Hickory Ridge to entities owned by Harriet Rostoff and Karen Harris, for no consideration. After these transfers, Karen Harris and Harriet Rostoff each owned 50% of Hickory Ridge. The "before" and "after" organizational structure of Hickory Ridge may be set forth diagrammatically as follows:

**Hickory Ridge Limited Partnership**
**Ownership as of 1990**

Hickory Ridge LP

| GP | LP | LP |
|---|---|---|
| 1% | 59% | 40% |
| Hickory Ridge Apartment Corporation | Hickory Ridge Apartment Two Corp | The Harriet–Hamilton Corporation |
| | President and Sole Member of BOD: David Rostoff | President: Harriet Rostoff |

David Rostoff 16.7%
Harriet Rostoff 16.7%
James Harris 16.7%
Stewart Levy 50.0%

7. James Harris, not a party before this Court, was a coconspirator of David and Steven Rostoff in the scheme to defraud a local bank of at least $2,000,000, which scheme was the basis for their criminal convictions. *See Rostoff,* 53 F.3d at 402–04. Harris was also convicted of conspiracy, bank fraud, and making false statements, and sentenced to a nine-month prison term followed by a period of supervised release under the supervision of George Santa Cruz, the same probation officer who supervised Steven Rostoff.

**Hickory Ridge Limited Partnership**
**Ownership as of 1995**

Hickory Ridge LP

| 1% GP | 59% LP | 40% LP |
|---|---|---|
| Hickory Ridge Apartment Corp | Hickory Ridge Apartment Two Corp | Harriet-Hamilton Corp |
| | | 100% |

| 50% | 50% | 50% | 50% | |
|---|---|---|---|---|
| Harriet Rostoff | Karen Harris | Harriet Rostoff | Karen Harris | Harriet Rostoff |

Sources: Articles of Incorporation, Bylaws, Hickory Ridge Limited Partnership Agreement of Limited Partnership and Florida Secretary, State Documents.

5. On May 16, 1989, David Rostoff and James Harris formed the Tanglewood Limited Partnership, which in turn acquired the Tanglewood Apartments ("Tanglewood"), a 408–unit apartment complex in Hammond, Indiana. The ownership of Tanglewood consisted of 16 limited partners, including the Rostoffs and James Harris, who collectively held 25 shares and 80% of the ownership interests, as well as two general partners— James Harris and the Patriot Indiana Corporation. David and Steven Rostoff each owned 25% of the Patriot Indiana Corporation. Combining their general and limited partnership interests, David and Steven Rostoff each owned 11.15% of Tanglewood.

6. As was the case with Hickory Ridge, although Tanglewood purportedly retained NHS and KHR to co-manage the apartment complex, almost all of the active management functions were performed by NHS. KHR was nothing more than a corporate shell used to funnel income from Tanglewood and Hickory Ridge to David Rostoff and James Harris through their wives. In short, David Rostoff and James Harris were able to skim significant funds off the top from both Tanglewood and Hickory Ridge in the form of "partner management fees" and consulting fees. This Court finds the testimony of the government's expert, accountant Christopher Barry, credible in all respects, and adopts his calculations as to the funds that were withdrawn in this manner.

7. In February of 1995, during the period of their supervised release, David Rostoff, James Harris, and Steven Rostoff assigned their respective general and limited partnership interests in the Tanglewood Apartments to corporate entities controlled by Harriet Rostoff and Karen Harris in conjunction with a commercial refinancing. In this transaction, the lenders took less than the face value of their notes, new financing was acquired, and all equity interests in Tanglewood, including those held by the Rostoff brothers and James Harris, were transferred to the entities controlled by Harriet Rostoff and

Karen Harris. Neither the Rostoff brothers nor James Harris received any consideration for these transfers. The "before" and "after" organizational structure of Tanglewood may be set forth diagrammatically as follows:

**Tanglewood Limited Partnership**
**Ownership as of 1989**

Tanglewood LP

GP LP

20%

1% 19% 80%

James Harris

Patriot Indiana Corp

| | |
|---|---|
| David Rostoff | 25% |
| Steven Rostoff | 25% |
| Neil Rostoff | 16.7% |
| James Harris | 16.7% |
| Eric Garvais | 16.6% |

| | |
|---|---|
| 1. David Rostoff | 6.4% |
| 2. Steven Rostoff | 6.4% |
| 3. Neil Rostoff | 6.4% |
| 4. James Harris | 6.4% |
| 5. Eric Gervais | 6.4% |
| 6. Richard Rostoff | 3.2% |
| 7. Harriet Rostoff | 3.2%* |
| 8. Debra Gervais | 3.2% |
| 9–16. Eight Others | 38.4% |

\* Funded in cash, all other LP interest funded by loans from US Trust or Fleet Bank.

Source Agreement of Tanglewood Partnership Agreement dated 5/18/89 and corporation tax returns of Patriot Indiana Corp. for the year 1993

**Tanglewood Limited Partnership**
**Ownership as of February 24, 1995**

Tanglewood LP

GP LP

20% 80%

Patriot Indiana Corp. KHR Properties, Inc.

50% 50% 50% 50%

Harriet Rostoff Karen Harris Harriet Rostoff Karen Harris

Source: Amendment to the Agreement of Tanglewood Limited Partnership and Gary Kravetz's statement on case facts and background.

8. Prior to the February, 1995 refinancing, the Tanglewood Apartments had a fair market value of $14,000,000,00, rather than the $15,300,000.00 testified to by the government's expert, accountant Christopher Barry. This Court otherwise adopts Mr. Barry's analysis concerning the breakdown of the individual partners' interests in Tanglewood, as set forth in Exhibit 116. Revising his calculations to reflect the Court's valuation of Tanglewood, this Court finds that David and Steven Rostoff *each* assigned interests with a net value of $145,000.00 to the entities controlled by Harriet Rostoff and Karen Harris.[8]

9. Although the closing date for the assignment of these interests in Tanglewood was February 18, 1995, neither the Rostoffs, nor James Harris, disclosed the transfers—as they were required to do—on the financial statements they filed with the United States Probation Office in late February and March, 1995. In these financial statements, the Rostoffs and James Harris each listed the shares in Tanglewood as their property when in fact they had been transferred days earlier. David Rostoff, Steven Rostoff, and James Harris also falsely reported that these Tanglewood interests had no value.

10. On December 1, 1995, George Santa Cruz, the probation officer who supervised Steven Rostoff and James Harris, instructed Steven Rostoff to provide him with more information regarding his Tanglewood interests. In response, Steven Rostoff mistakenly represented that his interest had been conveyed to United States Trust. Steven later submitted an affidavit, at Officer Santa Cruz's request, from the attorney who helped arrange the refinancing, Gary Kravetz, Esq. This affidavit failed to disclose that Steven had transferred his Tanglewood interests to entities controlled by Harriet Rostoff and Karen Harris. In fact, attorney Kravetz had

edited an October 1995 affidavit which had previously been provided to David Rostoff by removing all indications that Harriet Rostoff was one of the transferees.

11. James Harris falsely represented to the United States Probation Office that he was employed by Jeffrey Symmonds at NHS, and that he earned no income during the first thirteen months of his supervised release because he was not a good sales representative. When Officer Santa Cruz confronted Harris about his failure to earn any income, Harris produced a so-called salary check from NHS in the amount of $800. In fact, the $800 check was derived from an owner's draw out of Tanglewood, and was nothing more that an subterfuge to divert Officer Santa Cruz from inquiring further into Harris's activities. James Harris never worked as a sales representative for Jeffrey Symmonds, but rather was working full-time, with the assistance of David Rostoff, to restructure, refinance, and transfer the Hickory Ridge and Tanglewood apartments to Harriet Rostoff and Karen Harris.

12. David Rostoff and James Harris had numerous contacts during the twenty-four months of their supervised release in order to effectuate the restructuring, and actively sought to conceal these contacts from their respective probation officers. Both men attended a meeting with representatives of Sanwa Bank, the lender on the Hickory Ridge refinancing. When Harris went to attend this meeting in Peoria, Illinois, he falsely represented to Officer Santa Cruz that he was traveling there to review the policies and procedures of NHS and work as a sales representative. Furthermore, at the time of his initial trip out to Peoria, Harris falsely represented that he was on a job interview, when he was in fact signing a contract between Hickory Ridge and NHS,

---

**8.** At the time of the assignment, the Rostoffs' limited partnership interests in Tanglewood actually had a negative value of minus $22,000.00 each, but their general partnership interests had

a positive value of $167,000.00 each, thus netting out to $145,000.00 each. *See* EX. 116 (as revised to reflect the Court's valuation of Tanglewood).

retaining Jeffrey Symmonds to manage Hickory Ridge.

13. James Harris and David Rostoff, with the assistance of their agents, Jeffrey Symmonds, Attorney Gary Kravetz, and mortgage broker Philip Cohen, were the driving forces behind the restructure, refinance, and transfer of Tanglewood and Hickory Ridge. Harriet Rostoff and Karen Harris actively cooperated with their husbands but, having little experience in real estate matters, were much less intimately involved in the details.[9]

14. Steven Rostoff's participation in the restructure of Tanglewood was almost entirely passive. Prison—along with illness and familial difficulties—seems to have had a far greater personal effect on Steven Rostoff. Unlike David Rostoff or James Harris, he did not actively attempt to conserve his assets, and in fact possessed no clear understanding of their present value.

15. At the end of the probationary period, David and Harriet Rostoff were the owners as tenants in common of a luxury condominium in Boca Raton, Florida, which has a fair market value of $750,000.00 and is subject to a mortgage of $250,000.00. David Rostoff's undivided one-half interest therein thus has a net value of $250,000.00.

## IV. ANALYSIS AND RULINGS

During the period of supervised release, David and Steven Rostoff had an affirmative duty to marshal their assets to pay the restitution. Instead, David Rostoff, along with James Harris, aggressively undertook a scheme to conceal their assets while at the same time maximizing their value. David Rostoff, James Harris, Harriet Rostoff, and Karen Harris knowingly, intelligently, and voluntarily acted in concert to hide from the Probation Office the machinations of their successful restructure, refinance, and transfer of Tanglewood and Hickory Ridge. This was quite a coup for these four individuals— to hang on to equity interests that are still throwing off money at a time when they were so far under water.[10] Furthermore, to accomplish this scheme, David Rostoff, James Harris, and Harriet Rostoff committed repeated violations of 18 U.S.C. § 1001 by knowingly making false statements to federal officials in the discharge of their duties. In particular, this Court finds that David Rostoff perjured himself before this Court; his testimony was nothing but a tissue of lies and fabrications.

 The transfers by David Rostoff of his interests in Tanglewood and Hickory Ridge violated Judge Zobel's restitution order, and accordingly, this Court holds that they are void and of no effect. See supra page 5–6; see also 28 U.S.C. § 3304(a) (when a debt is already owed to the United States, any transfer of assets made by an insolvent debtor without receiving "reasonably equivalent value" in exchange for the transfer is fraudulent as to a debt of the United States).[11] Furthermore, as David Rostoff and James Harris effectively controlled Hickory Ridge and Tanglewood, using the corporate shell of KHR to funnel income to themselves (via their wives) in the form of "partner management fees," this Court con-

---

9. While their husbands were in prison, Harriet Rostoff and Karen Harris did their best to hold things together financially and maintain their husbands' assets in a manner that reflects the love and consortium they had for them. Karen Harris knew little or nothing about real estate, but Harriet Rostoff, learning on the job, had some appreciation of the management duties involved. The Court notes that, during that time period, the actions of Harriet Rostoff and Karen Harris were in no way invidious, and in fact praiseworthy. Although the restitution order had already been entered, David Rostoff was not in any position to begin marshaling his assets while incarcerated.

In contrast, once David Rostoff and James Harris left prison on supervised release and began their scheme to transfer and conceal their interests in Hickory Ridge and Tanglewood, Karen Harris and Harriet Rostoff became active wrongdoers.

10. Attorney Kravetz and the mortgage broker, Philip Cohen, did a fine job for David Rostoff and James Harris, coming up with millions of dollars to refinance the Tanglewood Apartments. This Court does not find, however, that either Attorney Kravetz, Mr. Cohen, or Mr. Symmonds were part of the conspiracy to hide these assets from the Probation Office.

11. An individual is "presumed insolvent if he fails to pay his debts as they become due." United States v. Lombardi, 924 F.Supp. 361, 363 (D.R.I.1996).

cludes that, but for the improper conveyances, there would have been a reasonable possibility of David using his interests in these assets, along with his half of the Florida condominium, to pay the restitution in full at some point in the future. Accordingly, this Court properly entered judgment against David Rostoff for $705,980.00, which represents the full amount of the unpaid restitution plus the ten percent surcharge imposed pursuant to 28 U.S.C. § 3011(a).

 Steven Rostoff presents a more difficult question, however. This Court found that, unlike David Rostoff and James Harris, Steven did not actively attempt to conserve his assets, and in fact did not seem to know or care about the value of his interests in Tanglewood. Nevertheless, while under a duty to marshal his assets, Steven did transfer these interests, which were worth $145,000.00 even before the refinancing, to the entities controlled by Karen Harris and Harriet Rostoff, for no consideration. Furthermore, in December, 1995, Steven Rostoff became an active co-conspirator of David Rostoff and James Harris when Officer Santa Cruz asked him about the refinancing and for the supporting affidavit. Although there is no evidence that Steven personally stood to benefit from this conspiracy—the real beneficiaries were James Harris and David Rostoff, who managed to maintain possession of these assets through straw transfers to their wives—this Court infers that at that point in time, Steven knew that he was concealing something that he should have told to Officer Santa Cruz.

The assignment by Steven Rostoff of his $145,000.00 interest in Tanglewood violated Judge Zobel's restitution order and is therefore void and of no effect. Unlike David Rostoff, however, Steven Rostoff 1) never had any interests in Hickory Ridge, 2) never

benefitted from the siphoning of income out of Tanglewood to KHR in the form of partner management fees, and 3) at the end of the supervised release period, did not have any other assets (such as a Florida condominium) which could have been used, at some point in the future, to satisfy the restitution order. Accordingly, upon further reflection, this Court vacates its judgment against Steven Rostoff for the full amount of the unpaid restitution, and instead enters judgment for $159,500.00, which represents his $145,000.00 interest in Tanglewood plus the ten percent surcharge imposed pursuant to 28 U.S.C. § 3011(a).[12]

## V. CONCLUSION

With respect to David Rostoff, judgment properly entered for $705,980.00, and accordingly his motion to alter the judgment is **DENIED.** Upon further consideration, however, the Court hereby allows in part Steven Rostoff's motion to alter the judgment. Accordingly, the Court **VACATES** its May 2, 1997 judgment against Steven Rostoff, and **ENTERS** judgment for $159,500.00. As to Steven Rostoff, interest shall run at the statutory rate from the date of the amended judgment.

## VI. EPILOGUE

The United States now has civil judgments against both Rostoffs but, in all likelihood, any attempt to execute these judgments will require further litigation. Although David and Steven Rostoff are bound by this Court's declaration invalidating the transfers of their respective shares in Tanglewood and Hickory Ridge, the other parties with interests in these apartment complexes (*e.g.*, the banks involved in the refinancing, James Harris, Karen Harris, and Harriet Rostoff), are not

---

12. This Court acknowledges that the $145,000.00 valuation of Steven Rostoff's interests in Tanglewood, which reflects the value of his shares prior to the refinancing, is somewhat conservative. After the refinancing, the net equity of the partners' interests in Tanglewood increased from $919,000.00 to $1,484,000.00. *See* Ex. 116 (revised to reflect Court's valuation of Tanglewood at $14,000,000.00). Although it is unlikely that any bank would have refinanced Tanglewood's mortgage debt with the Rostoffs or James Harris

still involved as general partners, they could have shifted that titular role to other parties, retained their limited partnership shares, and successfully obtained refinancing. This Court cannot determine with any certainty, however, what percentage of the increased value from the refinancing is fairly attributable to Steven Rostoff. As the burden of proof rests with the government, this Court has no choice but to rely upon the valuation of his shares prior to the refinancing.

litigants before this Court, and thus are not bound by its rulings. If the government now seeks to enforce the judgments by going after Tanglewood and Hickory Ridge, both of which do have significant value, all of these other parties have an absolute right to be heard in court. Thus, we may be in for yet another trial with respect to these properties.

Before concluding, this Court cannot help but address one further institutional issue—the work of the Probation Office. This Court is served by a first rate Probation Office, and after listening to Officer Santa Cruz testify, I conclude that he is an experienced probation officer who addressed this case, along with the many other cases for which he had responsibility, with a high degree of professionalism, zeal, and concern for the ex-offender.[13]

This Court also finds, however, that during the period in which Officer Santa Cruz supervised Steven Rostoff, he was required to carry an unreasonably heavy case load—between 90 to 100 offenders—when the appropriate standard of supervision for someone in his position was actually 57 offenders. Report of the Judicial Conference of the United States, Committee on Judicial Resources, September 1991 (adopting the staffing allocation formulas set forth in Policy and Management Coordination Division recommendation memorandum).[14] This Court takes judicial notice of the reasons why. Fed.R.Evid. 201.

The Judicial Conference of the United States, in an effort to present a credible budget to Congress, has sought funding for the Probation Office at a level that provides for only 84% of the personnel necessary to comply with the independently established work formulas for careful and competent supervision—not only of those offenders who commit financial crimes and may be a source of recovery for the government, but also of violent criminals who may pose a danger to the people of the United States because they are otherwise without proper supervision.[15] This choice, forced upon the courts by budgetary constraints, has a very real human cost, and the case at bar could not be a better example of it. In the view of this Court, if Officer Santa Cruz had not been forced to carry such an unreasonable case load, he would have uncovered the scheme by James Harris and David Rostoff to conceal their assets, and would have uncovered it in time to use his leverage as a probation officer to cause the Rostoffs to disgorge the assets that the government now seeks. The Rostoffs would have faced a simple choice: forfeit the assets (the transfers having been a legal nullity in any event), or go back to prison.

In terms of court time alone, this four day bench trial has imposed a charge of $70,000 on the taxpayers of the United States.[16]

---

13. This Court has no preexisting relationship with Officer Santa Cruz, and knows nothing of his work other than what was testified to at this trial.

14. This number reflects both the quantity and types of offenders that must be dealt with in the District of Massachusetts. In addition to the entire tragic array of violent crime, drugs, racketeering and the like, this district is a major financial center of the United States and consequently has a high level of complex financial and highly technical computerized crimes. Furthermore, with the advent of the United States Sentencing Guidelines, an increasing number of offenders are being placed under supervised release to complete their sentences.

15. See Judicial Conference of the United States, Report to Congress on the Optimal Utilization of Judicial Resources 83 (Nov.1996).

16. See Chappee v. Commonwealth, 659 F.Supp. 1220, 1227 n. 9 (D.Mass.1987), rev'd on other grounds, 843 F.2d 25 (1st Cir.1988) for the methodology used. The current per trial day cost is

$17,500, Beal Bank, Inc. v. Pittorino, Civil Action No. 97–10927 (D.Mass. May 14, 1997) (transcript regarding sanctions), so $17,500 per trial day for four days equals $70,000. The $17,500 per day cost is an average for all cases. Prior estimates are:

| | | |
|---|---|---|
| 1987: & 1989 | $10,000–$15,000 | Chappee v. Commonwealth, 659 F.Supp. at 1227 n. 9; In re Acushnet River & New Bedford Harbor, 712 F.Supp. 1019, 1030 (D.Mass.1989). |
| 1991: | $15,000 | Cabral v. Sullivan, 757 F.Supp. 107, 110 (D.Mass.1991), aff'd in part and rev'd in part on other grounds, 961 F.2d 998 (1st Cir. 1992). |
| 1993: | $16,000 | Scarpa v. DuBois, Civil Action No. |

This Court will not even attempt to quantify the costs already incurred by the United States Attorney's office in obtaining these civil judgments, or the further costs expected if it attempts to collect. Every one of these expenditures could have been avoided if the Probation Office had been funded at a level that permits the necessary staffing. In our efforts to economize, are we skimping on horseshoe nails? [17]

245655, at *6 n. 12 (D.Mass. June 24, 1993), rev'd on other grounds, 38 F.3d 1 (1st Cir.1994).

Updated figures break down to an average of $9,795 per trial day for civil cases and $47,950 per trial day for criminal cases. FY 1994 Total Resource Costs, Economy Subcommittee Office, Administrative Office of the U.S. Courts. "Total Resource Costs" are the entire FY 1994 Judiciary Budget (including the costs of the Courts of Appeals, Bankruptcy Courts, pre-trial services, probation officers, defenders of indigent criminals, and the like) divided by the number of daily district court sessions. Indeed, the actual "door opening" costs to process an average case amount to $4,300. Leonidas Ralph Mecham, Director of the Administrative Office, Memorandum to All Judges, Nov. 12, 1996 at 2. As the filing fee is only $150, the extent of the government subsidy of our preferred method of dispute resolution is readily apparent.

17. [A] little Neglect may breed great Mischief. for want of a Nail the Shoe was lost; for want of a Shoe the Horse was lost; for want of a Horse the Rider was lost; being overtaken and flain by the Enemy, all for want of Care about a Horse Shoe Nail.
Benjamin Franklin, *Poor Richard's Almanack* Preface: Note to Courteous Readers (1758); *see also* George Herbert, *Jacula Prudentum* (1651), *reprinted in The English Poems of George Herbert* 238 (Longmans, Green, and Co. 1891).