SPECIALIZED PLATING,
INC., Plaintiff,

v.

FEDERAL ENVIRONMENTAL
SERVICES, INC.,
Defendants.

In re Peter D. PREVETT, Esq.

Civil Action No. 95–10162–WGY.

United States District Court,
D. Massachusetts.

Aug. 25, 1997.

Peter D. Prevett, Andover, MA, for Specialized Plating, Inc.

Thomas E. Peisch, Conn, Kavanaugh, Rosenthal, Peisch & Ford, Boston, MA, James M. Campbell, Kathleen M. Guilfoyle, Campbell, Campbell & Edwards, Boston, MA, for Federal Environmental Services, Inc.

Leonard H. Freiman, Goulston & Storrs, Boson, MA, for Frank's Vacuum Truck Services, Inc.

## *REPORT*

YOUNG, District Judge.

After full and proper notice, attorney Peter D. Prevett ("Prevett"), counsel for Specialized Plating, Inc. ("Specialized Plating"), unaccountably failed to appear for trial. The Court promptly ordered Specialized Plating non-suited. Thereafter, Prevett, without adequate justification, sought to vacate the dismissal and reinstate the case for trial. The Court allowed the motion upon the conditions that Prevett 1) pay a sanction of $5,250 to the Clerk, United States District Court for the District of Massachusetts, and 2) hire an answering service.

Prevett complied with the sanction, went on to win the case for his client,[1] and appealed the sanction. The Court of Appeals has upheld the propriety of sanctioning Prevett[2]

---

1. Specialized Plating received judgment somewhat in excess of $8,000.

2. While the Court of Appeals opinion is unpublished, its holding concerning the propriety of this Court's proceedings is important to set the stage for what follows. Accordingly, it is reproduced below:

> The court's sanction order implicitly found that Attorney Prevett's failure to appear at trial resulted from his negligence and inattentiveness and, therefore, was not substantially justified. That finding is not clearly erroneous.

Therefore, [Fed.R.Civ.P.] 16(f) authorized the imposition of "just" sanctions.

Although there was no evidentiary hearing, Prevett received fair notice and an opportunity to be heard concerning whether his conduct warranted sanction. The appellants' motion to vacate the dismissal and their reply to the defendant's opposition to their motion, both drafted by Prevett, provided ample opportunity for Prevett to justify his failure to appear. "A hearing is not necessarily required [before the imposition of sanctions] where the court has full knowledge of the facts and is familiar with

and, while retaining jurisdiction has remanded for further proceedings concerning the reason for and extent of both aspects of the sanction. *Specialized Plating, Inc. v. Federal Environmental Services, Inc.*, No. 97–1343, 1997 WL 414102, at *2 (1st Cir. July 22, 1997) (unpublished disposition). Pursuant to that mandate, this Court submits the present Report, discussing separately each aspect of the sanction.

### The Monetary Sanction

■ This Court imposed the monetary sanction primarily to reimburse the taxpayers for the abuse of the judicial system and secondarily, specifically to deter Mr. Prevett from further abuse.[3]

Inspired by Judith Resnik, *Managerial Judges*, 96 Harv. L.Rev. 374, 423 n. 188 (1982), I determined, while a Justice of the Massachusetts Superior Court, that in those rare instances when it is appropriate to impose monetary sanctions, simply ordering a transfer of money between litigants is wholly inadequate. The judicial system of dispute resolution is not cost free and those who abuse it through misconduct impose direct costs on the law abiding taxpayers who support it. Professor Resnik's article taught me that those costs can be calculated with a fair degree of accuracy. Thereafter, in every instance where I have imposed a monetary sanction, I have sought to make whole the judicial system itself.

I set forth the methodology I use and the underlying assumptions in *Chappee v. Commonwealth*, 659 F.Supp. 1220, 1226–1228 nn. 9–10 (D.Mass.1987), *rev'd on other grounds*, 843 F.2d 25 (1st Cir.1988). To make this Report complete, I repeat it here in full. As *Chappee* involved a petition for *habeas corpus* by an inmate in Massachusetts custody, *see* 28 U.S.C. § 2254, the following excerpt begins with a discussion of the problems facing our sister trial court in Massachusetts, the Superior Court:

> To appreciate the magnitude of the problem facing the Superior Court justice, it is appropriate to note that in 1984, were the centralized docket of the Superior Court to be divided among its sixty sitting judges—the Chief Administrative Justice in Massachusetts is also a Superior Court justice but as he "does not sit in trial sessions there are 60 Superior Court justices available, at maximum strength," 57th Report of the Judicial Council of Massachusetts, 1986, p. 45 (remarks of Donahue, J.)—each Superior Court justice would be responsible for handling 1,290 pending civil cases and 76 pending criminal cases. For the total cases pending in the Superior Court in 1984, *see* Annual Report of the Massachusetts Trial Courts 139–40 (1984). (This may be compared with the 394 civil cases and 10 criminal cases presently pending in this session of the United States District Court—and this court is so notoriously lacking in judicial manpower that the Judicial Conference of the United States has recommended to Congress that two additional judgeships be created for this District). It is clear that, in attempting to manage its enormous case load the time each individual Superior Court justice spends actually presiding over and determining cases is at a premium.

the conduct of the attorneys." *In re Big Rapids Mall Assocs.*, 98 F.3d 926, 929 (6th Cir. 1996); *cf. Muthig v. Brant Point Nantucket Inc.*, 838 F.2d 600, 606–07 (1st Cir.1988) (motion for Rule 11 sanctions; briefing process provided adequate notice and opportunity to be heard).

Moreover, although the appellants contend that Prevett did not receive adequate notice of the trial date, the record does not reveal, and the appellants have not identified, a factual dispute concerning the notice actually given or the circumstances surrounding Prevett's failure to appear at trial. Indeed, the parties agree on the notice that they were given by the court. Under these circumstances, the district court neither abused its discretion nor violated due process by determining without a hearing that Prevett's conduct warranted sanction.

*Specialized Plating, Inc. v. Federal Environmental Services, Inc.*, No. 97–1343, 1997 WL 414102, at *1–2 (1st Cir. July 22, 1997) (unpublished disposition).

3. General deterrence of such misconduct by other attorneys and litigants was but an incidental result as the Court did nothing more than impose the sanction, see to it that a proper docket entry was made, and that the sanction was enforced. It seems proper, however, to publish the instant Report and perhaps thus achieve a modicum of general deterrence.

It is possible to place a per day monetary cost to the taxpayer on this process of adjudication—the core "product," if you will, of the judicial branch of government. For example, it has been estimated that in 1982 the costs, including salaries, support staff, and other resources of each federal district judge, came to $752,000 annually. J. Resnik, *Managerial Judges,* 96 Harv. L.Rev. 374, 423 n. 188 (1982) (citing J. Kakalik & A. Robyn, *Costs of the Civil Justice System: Court Expenditures for Processing Tort Cases* 64 (1982)). If 230 court days are devoted to actual adjudication (365–day year less 104 weekend days, 10 holidays, 20 vacation days, and 1 sick day) the per day cost to the taxpayer of adjudication in the federal district court comes to $3,270.

While comparable figures for the Massachusetts Superior Court are difficult to obtain due to the amalgamation of the various Massachusetts trial courts for budgetary purposes, one suspects that, given the extremely adverse conditions under which Massachusetts Superior Court justices are forced to work—*see, e.g., Sarrouf v. New England Patriots Football Club, Inc.,* Norfolk Superior Ct. No. 121012, slip op. at 12 n. 5 (April 24, 1985), *aff'd in part, rev'd in part,* 397 Mass. 542, 492 N.E.2d 1122 (1986); *Commonwealth v. Sperrazza,* Norfolk Superior Ct. No. 7772, slip op. at 18 n. 2 (December 31, 1984), *aff'd,* 399 Mass. 1001, 503 N.E.2d 648 (1987); Dispute Resolution in Massachusetts: Final Report of the Governor's Alternative Dispute Resolution Working Group 83–84 (November, 1986) (hereafter "Dispute Resolution") ( [referring to the Superior Court, this report states] "there is no adequate substitute for resources where resources are called for. Adequate secretarial assistance, office equipment, and office space are essentials that any institution must have to perform up to its capabilities. No amount of technique will paper over these deficiencies.")—the per day cost of Massachusetts Superior Court operations is considerably less. Indeed, in analyzing the economics of the judicial branch, the Massachusetts Judicial Council recently calculated the total cost of Superior Court oper-

ations in 1987 at $21,845,225. 57th Report of the Judicial Council of Massachusetts 30 (1986). Dividing this figure by the 230 day annual norm for active adjudication, and again by the 60 sitting Superior Court justices, leaves a cost to the Massachusetts taxpayer of $1,583 for each trial day in each active session of the Massachusetts Superior Court.

It must be remembered that these are the minimum reliable cost estimates. Fully amortizing the cost of court buildings could raise these estimates markedly. It is reliably estimated that today the per session per day cost of a session of the United States District Court is actually $10,000—$15,000. While a justice of the Superior Court, I estimated—from review of bills approved and accounts rendered—that the taxpayer cost of simultaneously running two multi-defendant trials with sequestered juries came to $15,504 per day, *See Big Dan's Tab: $504,270,* The Boston Globe, March 29, 1984, commenting on the trial in *Commonwealth v. Vieira, et al,* Bristol Superior Ct. No. 12265 (appeal pending), and the taxpayer cost of a Superior Court murder trial without a sequestered jury approximated $3,000 per day. *Commonwealth v. Sperrazza,* Norfolk Superior Ct. No. 7772, slip op. at 18 (December 31, 1984), *aff'd,* 399 Mass. 1001, 503 N.E.2d 648 (1987).

If the total 1984 appropriations for the various Massachusetts trial courts, Mass. St.1984, ch. 234, line items no. 0330–0100—039–2100 inclusive, are aggregated—thus including the rental costs of the various courthouses—the total appropriation for fiscal year 1985 comes to $193,593,101. If this sum is divided by the 281 justices of the various trial courts, Annual Report of the Massachusetts Trial Courts 13 (1985), and again by the 230 day norm for judicial sittings, the result rises to a taxpayer cost of $2,964 per Massachusetts judicial session per day.

To return to the instant case, each of the alternatives suggested by defense counsel would doubtless have involved a considerable disruption of the trial calendar in the Superior Court. At an absolute minimum,

receiving the testimony of the three defense experts would involve an additional half day of trial—precious time for which the Superior Court justice could not have been expected to make provision since defense counsel, in an attempt to prejudice the Commonwealth, failed to timely notify the court of these witnesses. Indeed, the disruption of other unrelated but tightly scheduled cases would most probably involve the loss of more than one half day of trial time. In any event, the minimum cost to the Massachusetts taxpayer from the misconduct of defense counsel here may be conservatively estimated at $791.50 (*i.e.,* one half of the per session full trial day cost of Superior Court operations).

On the issue of the feasibility of alternative sanctions, for example, it was open to the Superior Court justice to assess $791.50 or more against defense counsel as a sanction for failure to comply with the pre-trial agreement. This would serve to compensate the taxpayers of the Commonwealth for the loss defense counsel has caused them. It is also the "[s]tiff disciplinary sanction" that will effectively—and more fairly—deter attorney misconduct. *Fendler v. Goldsmith,* 728 F.2d 1181, 1186 (9th Cir.1984); Reznick, *The New Federal Rules of Criminal Procedure,* 54 Geo. L.J. 1276, 1294 (1966).

As an aside, if the figures cited in note 9 above are anywhere near accurate, the sanctions imposed by the Court of Appeals for the First Circuit for bringing frivolous appeals, *see, e.g., Chongris v. Board of Appeals of the Town of Andover,* No. 86–1761, slip op. at 7 (1st Cir. Dec. 31, 1986) (double costs and attorneys fees of $500

assessed); *Kelly v. United States,* 789 F.2d 94, 98 (1st Cir.1986) (double costs assessed); *Sullivan v. United States,* 788 F.2d 813, 816 (1st Cir.1986) (double costs assessed); *Gianfriddo v. Western Union Telegraph Company,* 787 F.2d 6, 7 (1st Cir.1986) (double costs and attorney's fees of $500 assessed), either substantially undervalue that Court's contribution to the judicial process or reflect the view that much lighter sanctions than those discussed here are effective to deter attorney misconduct.... *Compare* the sporadic and generally light sanctions imposed in civil cases in the Superior Court, Dispute Resolution, *supra* at 27–28, with the recent admonition by the American Bar Association that judges should impose sanctions for the abuse of the litigation process.".... In the Spirit of Public Service:" A Blueprint for the Rekindling of Lawyer Professionalism, A.B.A. Comm. on Professionalism 42 (1986) (noting indications that federal courts are making increased use of Federal Rules of Civil Procedure 11 and 26 to impose sanctions).

*Chappee,* 659 F.Supp. at 1226–28 nn. 9–10.

I wrote *Chappee* in 1987 and, while the methodology remains sound, costs have risen. I recently noted this fact in *United States v. Rostoff,* 966 F.Supp. 1275, 1287 n. 16 (D.Mass.1997), *appeal pending:*

The current per trial day cost is $17,500, *Beal Bank, Inc. v. Pittorino,* Civil Action No. 97–10927 (D.Mass. May 14, 1997) (transcript regarding sanctions).... The $17,500 per day cost is an average for all cases. Prior estimates are:

| | | |
|---|---|---|
| 1987: & 1989 | $10,000–$15,000 | *Chappee v. Commonwealth,* 659 F.Supp. at 1227 n. 9; *In re Acushnet River & New Bedford Harbor,* 712 F.Supp. 1019, 1030 (D.Mass.1989). |
| 1991: | $15,000 | *Cabral v. Sullivan,* 757 F.Supp. 107, 110 (D.Mass.1991), aff'd in part and rev'd in part on other grounds, 961 F.2d 998 (1st Cir.1992). |
| 1993: | $16,000 | *Scarpa v. Dubois,* Civil Action No. 245655, at *6 n. 1, 1993 WL 245655 (D. Mass. June 24, 1993), rev'd on other grounds, 38 F.3d 1 (1st Cir.1994). |

Updated figures break down to an average of $9,795 per trial day for civil cases and $47,950 per trial day for criminal cases. FY 1994 Total Resource Costs, Economy Subcommittee Office, Administrative Office of the U.S. Courts. "Total Resource Costs" are the entire FY 1994 Judiciary Budget (including the costs of the Courts of Appeals, Bankruptcy Courts, pre-trial services, probation officers, defenders of indigent criminals, and the like) divided by the number of daily district court sessions. Indeed, the actual "door opening" costs to process an average case amount to $4,300. Leonidas Ralph Mecham, Director of the Administrative Office, Memorandum to All Judges, Nov. 12, 1996 at 2. As the filing fee is only $150, the extent of the government subsidy of our preferred method of dispute resolution is readily apparent.

*Rostoff*, 966 F.Supp. at 1287–88 n. 16.

A conservative estimate of the full per judge day cost of the judicial system at the time of Prevett's misconduct is therefore $17,500. I assumed a ten hour judge work day,[4] making each hour of wasted time worth $1,750. Then I calculated that Prevett had wasted three hours of the Court's time. Three times $1,750 equals $5,250.

In truth, the Court had scheduled four hours, from 9:00 a.m. to 1:00 p.m. on the day Mr. Prevett failed to appear, to commence the jury waived hearing of his case, with the trial to continue daily thereafter on the same schedule until completed. Afternoons are routinely filled with motions, sentencings, pre-trial conferences and the like. In the present instance, thanks to the extraordinarily skillful management of Elizabeth Smith, the Courtroom Deputy Clerk, we were up and running the following day with another jury waived case. Discounting the lost morning by 25%, I assessed the sanction

based on three hours of judicial resource time.

Prevett may argue that three hours lost time is excessive because I was not totally unproductive during the morning he wasted. There is some truth to this. Actually, I remained in the lobby of the courtroom for no more than thirty minutes while we waited for Prevett and futilely called his office trying to contact him (he had gone to a Massachusetts district court to attend to some other matters). Once I had non-suited his client, I returned to chambers and spent the rest of the morning immersed in paperwork. It can thus be argued that Prevett caused no more than thirty minutes of down time.

To so conclude, however, is totally to misunderstand the duties of a United States District Court Judge. As Jack Meagher, the senior active justice of the Massachusetts Superior Court taught me when I joined the bench: "This is a trial court. A trial judge should go on the bench every day and try cases." William G. Young, *Some Needful Things, in Federal Court Judicial Forum 1996* 767, 768 (MCLE 1996). There can be a no more profound admonition to a United States District Judge. Trying cases is the highest and best use of a district judge's time. After all, under the Constitution, an Article III judge is the only one who can try cases. Everything else—**everything** else—can be delegated in the first instance to other members of the court session. The judge who arranges her schedule so that a significant portion of every day is spent on trial will find all other aspects of the judicial office falling into place and will, at the same time, insure the most "just, speedy, and inexpensive" resolution of every assigned case.[5] See Fed.R.Civ.P. 1. Mr. Justice Meagher's dictum is the prime goal of this session, year in and year out.

Mr. Prevett's negligence frustrated that goal, threw the carefully planned trial sched-

---

4. This is overly generous to Prevett because I do not, on average, work ten hours per day. It has the advantage, however, of simplifying the calculations.

5. I have since reflected that Mr. Justice Meagher's dictum is, for trial judges, on the same plane as Lord Nelson's famous admonition for naval

captains. "No captain can do very wrong if he places his ship alongside that of an enemy." A.B.C. Whipple, *Fighting Sail* 139 (1978). In short, the "job" of judging is just that—going out on the bench and judging. No judge who does that, and does it daily, "can do very wrong."

ule out of kilter (only marginally because Ms. Smith is extraordinarily resourceful and resilient), and reduced the Court to acting on various inconsequential motions (the type of activity that fills up any slack court time and can usually be accomplished while on the bench during a jury trial).

There is, moreover, another burden that Mr. Prevett's negligence thrust upon the Court system. It is a burden difficult to quantify but significant nonetheless. Due to his negligence, the courtroom lay "dark" for the better part of a trial day. The people of the United States erected and furnished this beautiful courtroom [6] in order that their important adversarial business could promptly and justly be addressed. Whenever a courtroom lies "dark," it may appear that this precious resource is being wasted. Such a perception, if it becomes pervasive, can carry with it the consequence of hindering much needed restoration and construction of federal courthouses nationwide. While such a consequence can hardly be laid at Prevett's feet, it is far from speculative, see United States General Accounting Office, *Courthouse Construction: Better Courtroom Use Data Could Enhance Facility Planning and Decisionmaking* 2–5 (May 1997), and Prevett's incompetence contributes to it more than marginally.[7]

While this Court imposes sanctions but rarely, see *Metrocorps, Inc. v. Eastern Mass. Junior Drum & Bugle Corps, Assoc.*, 912 F.2d 1, 3 (1st Cir.1990) (reversing this Court's **failure** to impose sanctions), when it does so it seeks fully to reimburse the public for the abuse of its court system. Here, in light of the considerations just discussed and the generosity to Prevett of the per judge

hourly rate adopted herein, a sanction equivalent to three hours of wasted court time was fair and appropriate.

### The Answering Service Sanction

■ Mr. Prevett does not return his phone calls—ever. Moreover, on those rare occasions when he answers his phone, he is rude and uncompromising in his insistence that his schedule, whatever it may be, take precedence over that of this Court. It is simply wearing beyond all the reasonable stresses imposed on our Courtroom Deputy Clerks to expect them constantly to threaten non-suit or default just to catch the attention of an attorney who is ostensibly an officer of this Court.

Against this background, when Prevett sought reinstatement of his client's suit, this Court was convinced that his routine manner of practice was and would remain, at least in this Court, so negligent on behalf of his client as to violate Local Rule 83.6 which incorporates the Massachusetts disciplinary rule DR 6–101, as contained in Supreme Judicial Court rule 3:07. Looking for a way to "get through" the pending action on the merits, the Court hit on the sanction of requiring Mr. Prevett to hire an answering service. At least, I reasoned, he will get the Court's messages from a live body who might impress him with their urgency (as would the sanction of paying for the service) and the Court would establish an arguably better record of notification (against Mr. Prevett's expected obfuscatory denials). At least with respect to the instant case, this appears to have worked well.

How long ought the sanction continue? In all candor, I gave no thought to the matter

---

6. The courtroom is an exact copy of the Massachusetts Superior Courtroom in Newburyport designed by Bullfinch. *See Courthouses of the Commonwealth* 39 (Robert Brink, ed., 1984); Elizabeth Neuffer, *Judge To Get a Homecourt Advantage*, B. Globe, June 13, 1989, at 17.

7. There is, of course, a way to avoid such courtroom downtime even if only few attorneys are as willfully incompetent as Prevett. Justice Cornelius J. Moynihan of the Massachusetts Superior Court, best known to generations of first year law students as the author of *Introduction to the Law of Real Property: An Historical Background of the Common Law of Real Property and Its Modern*

*Application* (West 2d ed.1988), used to "stack" cases to avoid loss of courtroom time. On occasion, he would have upwards of fifty lawyers, litigants, and witnesses milling around the courthouse halls waiting their turn for trial. Such extreme measures, however, violate the spirit of the Civil Justice Reform Act, Pub.L. No. 101–650, Title I, § 103(a), 104 Stat. 5090 (1990) 1990 U.S.C.C.A.N. 6802, and the differential case management plan adopted in 1991 in this Court's Costs and Delay Reduction Plan, see D. Mass. Expense and Delay Reduction Plan, Local Rules 1.01 –6.01 and Appendices A and B, adopted Nov. 18, 1991.

beyond the present case. A quick check of this Court's electronic data base, however, reveals that Prevett appears as counsel in the following two cases now pending in this district: *Wagner v. Luckett & Farley, Inc.*, Civil Action No. 97–11616–PBS (D. Mass. filed July 22, 1997); *Three Dimensional v. Federal Environmental Svcs., Inc.*, Civil Action No. 96–11340–WGY (D. Mass. filed July 1, 1996). While I recognize and appreciate that the purpose of the present remand was to give me a chance to explain myself and the remand does not constitute a blanket invitation to make gratuitous suggestions, I am sufficiently bold respectfully to recommend that the answering service sanction ought continue through the trial or alternate resolution of these cases and then, if there is no other complaint of Prevett's behavior, ought terminate.